**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| FULCRUM CREDIT PARTNERS LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. A-10-CA-137LY |
| | § | |
| STRATEGIC CAPITAL RESOURCES, INC. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT STRATEGIC CAPITAL RESOURCES, INC.'S AMENDED MOTION**
**FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

TO THE HONORABLE LEE YEAKEL, U.S.D.J.:

NOW COMES, Defendant Strategic Capital Resources, Inc. (hereinafter "Strategic" or "Defendant") and files this its *Amended Motion for Summary Judgment and Brief in Support* in the above-styled and numbered cause. Strategic hereby moves for summary judgment on the claims brought by Fulcrum Credit Partners, LLC (hereinafter "Fulcrum" or "Plaintiff") pursuant to FED. R. CIV. P. 56 as set forth below. In support thereof, Strategic shows the Court as follows:

## I.   INTRODUCTION

If Fulcrum is to be believed, basic concepts of contract law do not apply to the world of bankruptcy claims trading. This must be so, because Fulcrum is asking this Court to enforce a supposed agreement in a manner that would contravene many of the fundamental tenets of contract formation. However, the undisputed summary judgment evidence and applicable law compel a different result.

Strategic maintains that summary judgment is appropriate on a variety of grounds. First and foremost, Strategic contends that the parties did not enter into a binding and enforceable contract for Strategic to sell bankruptcy claims to Fulcrum because they never reached an

agreement concerning several material terms.  Not only did the parties fail to even discuss (much less agree to) the crucial issue of recourse, but they also failed to reach an agreement concerning numerous other terms that would have defined their respective obligations under this proposed sale.  Under a straightforward application of contract law, there was no enforceable contract.

Fulcrum also seeks damages that are contrary to settled law.  Fulcrum appears to seek disgorgement of profits Strategic received when it sold its bankruptcy claims to another buyer.  However, this is not a proper measure of damages for breach of contract.  If Fulcrum prevails on a breach of contract theory, it is entitled (at most) to its expectation damages—the profits, if any, it can prove it would have received had it "flipped" the bankruptcy claims to a subsequent buyer.  Fulcrum is not entitled to also recover profits realized by Strategic when it sold its claims to another party.  At the same time, Strategic has pled alternative causes of action seeking profit disgorgement: unjust enrichment and money had and received.  Neither of these causes of action are viable and summary judgment should be granted as to these alternative claims.

Fulcrum may believe that it operates in a "market" that is exempt from contract law or in which basic concepts of mutual assent do not apply.  Even were this true for Fulcrum, Strategic does not operate in this "market."  Strategic, a novice to bankruptcy claims trading, is instead entitled to application of fundamental rules of contract formation to the contemplated transaction with Fulcrum.  Applying those settled principals of contract law to this dispute, the inexorable conclusion is that the parties never entered a binding contract and that complete summary judgment in Strategic's favor is the appropriate result.

## II.    SYNOPSIS OF GROUNDS FOR SUMMARY JUDGMENT

Defendant Strategic Capital Resources, Inc., moves for summary judgment pursuant to FED. R. CIV. P. 56.  Strategic moves for summary judgment on the following grounds:

(1)     The parties did not enter into an enforceable contract. Plaintiff's breach of contract claim fails as a matter of law because there was no agreement to several material terms of the proposed transaction, including recourse, warranties and representations, indemnity and confidentiality. Without agreement on these terms, which defined the parties' obligations under the proposed transaction, there was no contract.

(2)     Plaintiff seeks disgorgement of profits Strategic realized when it sold its claims to another buyer. Disgorgement of profits is not a proper measure of damages for breach of contract. Plaintiff is entitled to, at most, the net profits it would have realized had it sold Strategic's claims to Fortress.

(3)     Plaintiff's claim for "unjust enrichment" fails as a matter of law because unjust enrichment is not a proper remedy where a plaintiff relies upon a written contract. Alternatively, if there is no enforceable contract, there is no evidence that Strategic was enriched "unjustly."

(4)     Plaintiff's claim for "money had and received" fails as a matter of law, as there is no allegation or evidence that Strategic is holding money that properly belongs to Fulcrum.

(5)     There is no cause of action that would support Fulcrum's claim that it is entitled to recover damages in the amount of the proceeds of Strategic's sale of its trade claims.

## III.     SUMMARY JUDGMENT FACTS

### A.     Background of the Parties

Defendant Strategic Capital Resources, Inc. is in the business of purchasing model homes from, and then leasing them back to large homebuilders. Deposition of David Miller, Exh. A at 14:12-15:16.[1] David Miller is the principal owner of Strategic, founded in 1995. Exh. A at 13:2-13; 16:2-4. Strategic currently has approximately "six or seven" employees. Exh. A at 13:14-16.

---

[1] All Exhibit references are to "Appendix to Strategic Capital Resources, Inc.'s Amended Motion for Summary Judgment and Brief in Support" filed concurrently herewith.

Neither Strategic nor Mr. Miller had ever sold a bankruptcy trade claim before they entered discussions with Plaintiff in October of 2009. Exh. A at 64:24-65:8. Indeed, Mr. Miller did not have an understanding of bankruptcy claims trading when he entered discussions with Plaintiff. Exh. A at 79:8-11.

Fulcrum Credit Partners, LLC was formed in 2007. Deposition of Matthew Hamilton, Exh. B at 22:10-15. Matthew Hamilton and Timothy Horrigan were Fulcrum's founders and are its two principal owners. Exh. B at 22:19-21; 25:10-12. Fulcrum's primary business is the buying and selling of distressed trade claims and bank loans. Exh. B at 43:8-19.

**B.     TOUSA Bankruptcy and Strategic's "Trade Claims"**

The bankruptcy claims at issue in this dispute arise from several transactions between Strategic and TOUSA Homes, Inc. These "land banking" agreements involved multiple agreements by homebuilder TOUSA Homes, Inc. to purchase back from Strategic several home lots that Strategic owned in Florida and Nevada. Exh. A at 19:15-21:24. TOUSA, Inc., the parent company of TOUSA Homes, Inc., was a guarantor on these contracts. Exh. A at 22:3-13.

In January 2008, TOUSA, Inc. and most of its subsidiaries (including TOUSA Homes, Inc.) filed for Chapter 11 Bankruptcy.[2] Strategic's remaining unsecured claims in the TOUSA Bankruptcy totaled approximately $46 million. Exh. A at 23:21-25:11. These claims derived from the "land banking" agreements between Strategic and TOUSA Homes, Inc. guaranteed by TOUSA, Inc. Exh. A at 23:21-25:11. In other words, Strategic's economic loss as a result of TOUSA's non-payment eventually was $46 million.

**C.     Fulcrum Contacts Strategic Concerning Its Claims in the TOUSA Bankruptcy**

On **July 22, 2008**, Fulcrum first contacted Strategic, by email from Peter Herzog of Fulcrum

---

[2] *In re TOUSA, Inc.,* U.S. Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, Case No. 08-10928-JKO (hereinafter the "TOUSA Bankruptcy"). Strategic asks the Court to take judicial notice of the TOUSA Bankruptcy action.

to David Miller, concerning potential acquisition of Strategic's claims in the TOUSA Bankruptcy. Deposition of Peter Herzog, Exh. C at 60:18-61:3; 63:1-3; Exh. A at 26:4-19; *see also,* March 1, 2010 Affidavit of David Miller, Exh. D at ¶ 6.  Mr. Herzog and Mr. Miller did not know each other prior this initial email contact.  Exh. C at 63:2-7; Exh. A at 26:17-22.  Following his initial contact, Mr. Herzog concluded that Mr. Miller might be willing to sell his claims for approximately 20 cents on the dollar.  Exh. C at 67:8-68:5.

There was little substantive contact between Strategic and Fulcrum for the next year.  Then, in an **October 13, 2009**, email exchange, Mr. Miller indicated to Mr. Herzog that he would be willing to sell Strategic's TOUSA Bankruptcy Claims to Fulcrum for 3% (i.e., three cents on the dollar).  Exh. A at 36:1-19; Exh. C at 87:5-88:4.  Mr. Herzog initially responded that he could not get approval at this price from his "analyst."  Exh. C at 110:7-111:7.  *See also*, October 14, 2009, Email from Herzog to Miller, Exh. E.  Nonetheless, Mr. Herzog told Mr. Miller that he would be sending him Fulcrum's Standard Terms and Conditions, and that the next step would be for Mr. Miller to respond by saying either "hey it looks good" or "here are my comments."  Exh. A at 34:7-17.  Herzog commented to Mr. Hamilton that "[m]y guess is that this guy is out of touch with the process; one reason why he offered it to me so quickly."  Exh. B at 75:5-76:2; Exh. C at 85:5-16.

Thereafter, Mr. Herzog sent Mr. Miller a copy of a document titled "Standard Terms and Conditions for Distressed Trade Confirmations" (hereinafter the "STCs").  Exh. C at 88:18-89:1; *see also* Exh. E;   Standard Terms and Conditions, Exhibit F.   Mr. Herzog, the Fulcrum representative responsible for communicating with Mr. Miller, could not identify a single instance where Mr. Miller affirmatively assented to or signified agreement to the STCs.  Exh. C at 98:4-99:10.  Nor had Mr. Herzog mentioned or discussed the concept of recourse as it would relate to this potential transaction.  Exh. A at 44:24-45:17.

**D.**   **Continued Communications Between Strategic and Fulcrum and Strategic's Marketing of its TOUSA Claims to Other Potential Buyers**

On **October 26, 2009**, Mr. Herzog had a phone conversation with Mr. Miller concerning the potential sale.  In his phone log, Mr. Herzog noted that Mr. Miller "won't give me an offering" and "seems educated and willing to shop it," meaning that Mr. Miller was willing to "shop the sale of the claim."  Exh. C at 69:7-70:10; *see also*, Mr. Herzog's CRM Log of Miller's TOUSA Claim, Exh. G at 5.  It was clear to all that Mr. Miller was willing to talk to other purchasers besides Fulcrum.  Exh. C at 70:24-71:6.  In fact, in a separate email communication between Mr. Herzog and Messrs. Hamilton and Horrigan, Mr. Herzog noted that "I think he is shopping this thing."  Exh. C at 139:10-140:19.  Exh. B at 133:7-24.

On **November 25, 2009**, Mr. Herzog received authority to bid on Strategic's claims.  Exh. C at 73:9-15.  Following a phone conversation with Mr. Miller, Mr. Herzog recorded the following entry in his log:

> Not interested at [XX][3]; but will come off his [XX] number.  He has guys calling giving indications; one guy says he can't take the whole thing.  Wants to be sold and closed by Dec 31st.

Exh. C at 73:24-74:5; Exh. G at 4.  However, there was no agreement by December 31st.

Communications between Strategic and Fulcrum continued intermittently through December and into January.  On **January 15, 2010**, Mr. Miller sent an email to Mr. Herzog in which he disclosed that he had entered an agreement to sell Strategic's TOUSA Bankruptcy claims to another party.  Exh. C at 158:12-23.  The potential sale referenced in Mr. Miller's January 15, 2010 email to Mr. Herzog did not close due to the potential buyer's failure to complete due diligence by their agreed deadline.  Exh. A at 110:12-111:3.

---

[3] The notation [XX] indicates quoted but redacted material considered "Confidential" by Plaintiff pursuant to the Protective Order entered in the matter.

**E.    Fulcrum Sends "Trade Confirmation" to Strategic**

On **February 4, 2010**, in an email exchange between Mr. Miller and Mr. Herzog, Mr. Herzog wrote "[c]onfirming *you are offering* all $46MM of the TOUSA claim at [XX] subject to a [XX] holdback." Exh. C at 176:5-12 (emphasis added). Mr. Miller responded, "[c]onfirmed with two week closing." Exh. C at 176:13-16. At this point in time, neither Mr. Herzog nor anyone with Fulcrum had discussed or even mentioned recourse in conversations with Mr. Miller. Exh. A at 44:24-45:17; Exh. C at 183:15-184:4. At the same time, Fulcrum asserts that it had an agreement to sell those same TOUSA Bankruptcy claims to Fortress. Exh. B at 137:9-16.

In response to Mr. Miller's February 4th offer, Fulcrum (through Mr. Hamilton) sent Mr. Miller a **February 5, 2010**, email with the subject line "TOUSA Trade Confirm." Exh. A at 147:7-15. *See also*, February 5, 2010 email from Mr. Hamilton to Mr. Miller, Exh. H ("Trade Confirm"). The body of the February 5th email contained several items concerning the proposed transaction, but there was no mention of recourse. *See* Exh. H. Next to a row entitled "Transfer Documents" was, under the description heading, "Market standard PSA." Exh. H at 2. The "PSA" was not attached to this email, although the STCs were attached. *See* Exh. H. There was no signature block or other means on the "trade confirm" email or STCs by which either party could signify agreement to the terms contained therein. Exh. H.

**F.    Strategic Sends Purchase and Sale Agreement to Fulcrum**

On **February 23, 2010**, Mr. Herzog emailed a proposed Purchase and Sale Agreement (hereinafter "PSA") to Mr. Miller. Exh. B at 168:21-169:6; Purchase and Sale Agreement, Exh. I. This was the first and only time that the PSA was sent to Mr. Miller by Fulcrum. *Id.*; Exh. D at ¶ 4. Again, prior to the transmission of this email, no one at Fulcrum had ever discussed or addressed the concept of recourse with Mr. Miller, let alone any proposed terms of such a provision. Exh. C at

183:15-184:4; Exh. A at 44:24-45:17.  The PSA contained a signature block for execution by both

Strategic and Fulcrum.  Exh. I at 12.

The PSA contained several terms that were either not included in, grossly expanded upon or

materially deviated from the STCs:

- The STCs stated only that the PSA shall contain "customary provisions for the purchase and sale of bankruptcy claims including but not limited to (a) representations of warranties is the type, quality, status and free alienability of the claim . . ."  The PSA contained twenty-five (25) separate representations and warranties.  Exh. B at 153:21-154:4.  *Compare* Exh. F at ¶ 6 *with* Exh. I at ¶2.1(a)-(y).

- In a portion of one sentence in the STCs, recourse was addressed as follows: "recourse provisions allowing for Seller's subsequent repurchase of the Claim (or the affected portion thereof) in the event of a disallowance, impairment, reduction or offset."  The PSA contained a lengthy paragraph concerning the grounds for recourse, the calculation of the repayment to Fulcrum in the event of "impairment and disallowance" and a provision that the repayment to Fulcrum will be subject to an interest rate of ten percent (10%) per annum.  *Compare* Exh. F at ¶ 6 *with* Exh. I at ¶ 3.  There was no discussion of interest rate in the STCs.  Exh. B at 159:23-160:6.  Notably, there was also no provision for interest paid to Strategic on the 25% amount heldback.  *See* Deposition of Timothy Horrigan, Exh. J at 126:7-23.

- The STCs did not contain an indemnity paragraph and did not even contain the terms "indemnity" or "indemnify."  The PSA, on the other hand, included a full indemnity paragraph.  Exh. B at 155:12-24; 157:7-158:4.  *Compare* Exh. F *with* Exh. I at ¶ 2.1.

- The STCs contained a brief confidentiality provision, in normal type, binding only on the seller.  The PSA contained extensive confidentiality language, in all caps, including a provision that in the event of a breach of confidentiality, "SELLER SHALL BE LIABLE FOR LIQUIDATED DAMAGES TO BUYER IN AN AMOUNT EQUAL TO 25% OF THE PURCHASE PRICE PAID TO SELLER UNDER THIS AGREEMENT." *Compare* Exh. F at ¶ 11 *with* Exh. I at ¶ 7 (caps in original).  Mr. Hamilton described this provision of the PSA as a "red herring . . . because we knew at the time Mr. Miller was in breach of his confidentiality provisions."  Exh. B at 160:21-161:11.

- The STCs provided that any dispute concerning the proposed transaction "shall be brought in the State or Federal courts located in Travis County, Texas."  There was no mention of right to demand a jury trial.  The PSA, on the other hand, stateed that each party consented to jurisdiction of the courts located in the State of New York and "irrevocably waive[ed] any defense of improper venue or forum non conveniens to any such action brought in those courts . . ."  The PSA also provided that the parties "waive[ ] any right to demand trial by jury."  Exh. B at 163:10-165:21; *Compare* Exh. F at ¶ 12 *with* Exh. I at ¶ 9.

Following the lengthy examination of Mr. Hamilton concerning the differences between the STCs and the PSA, and specifically concerning both jurisdiction of New York state court and the waiver of jury trial, the following, very telling exchange occurred:

> Q. (By Mr. Otto)  You see that.  Now, where, in this agreement, the terms and conditions of October 14th, 2009, does it say that?
>
> A.      Where does...
>
> Q.      Yes, where is that language?
>
> A.      They are not the same document.
>
> Q.      I agree.  They are not, and I guess that's the point.

Exh. B at 164:22-165:3.

## G.      Strategic Rejects Fulcrum's Proposed PSA

Within hours after receiving the PSA by email, Mr. Miller emailed Mr. Herzog and rejected the proposed PSA.  Exh. C at 199:5-200:22; February 23, 2010, email from Mr. Miller to Mr. Herzog, Exh. K.   Mr. Herzog immediately phoned Mr. Miller, and Mr. Miller communicated that the proposed PSA was unacceptable because it contemplated a sale with recourse.  Exh. C at 203:6-204:13; Transcription of Digital Audio Recording Between Pete Herzog and David Miller on February 23, 2010, Exh. L at 2:8-11.

Mr. Herzog attempted to continue negotiations, advising that if the recourse language was the basis for Mr. Miller's objection, "I'll tell my counsel that that's the sticking point, okay?" Exh. C at 204:8-13; Exh. L at 2:22-25.   When Mr. Miller did not agree to this proposal, Mr. Herzog began to claim that the parties had an agreement to buy the claims and disclosing (for the first time) that he had been secretly recording his conversations with Mr. Miller.  Exh. L at 5:20-6:2.  Mr. Miller responded to this revelation by concluding, "[y]ou know what, sue me." Exh. L at 6:5.

Strategic sold a portion of its TOUSA Claims shortly thereafter to Jefferies Leveraged Credit Products, L.L.C. ("Jefferies") on a non-recourse basis. Exh. D at ¶ 7. Strategic sold the remaining portion of its claims against TOUSA Homes to Jefferies thereafter under the same terms and at the same price. Exh. A at 252:20-253:10.

## IV.      SUMMARY JUDGMENT STANDARD

"The purpose of summary judgment is to pierce the pleadings and assess the proof to determine if a genuine need for trial exists." *Quinn v. West*, 140 F.Supp.2d 725, 731 (W.D. Tex. 2001). Summary judgment is appropriate where the record demonstrates that there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); FED. R. CIV. P. 56(c).

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden is met, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Industrial Co. v. Zenith*, 475 U.S. 574, 585-87 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir. 1987).

Summary judgment is also proper if a defendant can show there is no evidence to support an essential element of plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A dispute is genuine if the issue could be resolved in favor of either party." *Id.* (citations omitted). "A fact is material if it might reasonably affect the outcome of the case." *Id.* (citations omitted). The court views the evidence in a light most favorable to the non-moving party. *Id.* Once the moving party has met its burden, the non-moving party has a duty to respond setting forth facts

showing there is a genuine issue for trial. *Id.* If the non-moving party fails to do so, summary judgment shall be granted against it. *Id.*; FED. R. CIV. P. 56(e).

## V.     ARGUMENT AND GROUNDS

**A.     Fulcrum's Breach of Contract Claim Fails Because The Parties Never Entered a Binding and Enforceable Contract**

While the world of bankruptcy claims trading is an opaque one and the nuances of this niche practice are somewhat unique, the essential question in this suit is simple and straightforward - did the parties agree to the essential terms of the proposed transaction with sufficient detail to form a binding and enforceable contract? The undisputed facts of this suit demonstrate that the answer must be "no" and complete summary judgment is appropriate in Strategic's favor.

The basic tenets of contract law need not be set aside in this instance just because Fulcrum says so or because it conducts its business in an esoteric arena (one with which Strategic was utterly unfamiliar). Indeed, Fulcrum's preferred reading of contract law in this case would render concepts of "mutual assent" and "material terms" meaningless.

No contract was formed between Fulcrum and Strategic as a matter of law because (1) there was no mutual assent to the essential terms of Fulcrum's contemplated purchase of Strategic's trade claims and (2) Strategic never assented to or agreed to be bound by the material terms of the PSA once it was presented by Fulcrum. On this basis, summary judgment in Strategic's favor is appropriate as a matter of law.

1.     Threshold Requirements for Contract Formation

The requirements for formation of a binding and enforceable contract are familiar ones. "It is well-settled that a binding contract must have an offer and an acceptance, and the offer must be accepted in strict compliance with its terms." *Advantage Physical Therapy, Inc. v.*

*Cruse*, 165 S.W.3d 21, 25 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *Am. Nat'l Ins. Co. v. Warnock,* 114 S.W.2d 1161, 1164 (Tex. 1938).). "The parties must have a meeting of the minds, and each party must communicate its consent to the terms of the agreement. The offer must be clear and definite just as there must be a clear and definite acceptance of all terms contained in the offer." *Id.* at 25-26 (citations omitted). Additionally, "[t]o form a binding contract, the party to whom the offer is made must accept such offer and communicate such acceptance to the person making the offer." *Id.* at 26.

Significantly, "[u]nder Texas law ... an agreement is not enforceable unless it resolves all essential terms and leaves no material matters open for future negotiation." *APS Capital Corp. v. Mesa Air Group, Inc.*, 580 F.3d 265, 272 (5th Cir. 2009) (quoting *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415 (5th Cir. 1995).). Where an agreement leaves essential terms open for future negotiations, it is not a binding contract but, rather, an unenforceable agreement to agree. *Id.* (citing *Liberto v. D.F. Stauffer Biscuit Co.,* 441 F.3d 318, 323 (5th Cir. 2006)). *See also Fort Worth Independent School Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000) (citations omitted) ("It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree").

Finally, in order for a contract to be enforceable, its terms must be sufficiently certain to define the nature and extent of the parties' obligations. *See, e.g.*, *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *Sadeghi v. v. Gang*, 270 S.W.3d 773, 776 (Tex. App.—Dallas 2008, no pet. h.) (contract, whether written or oral, must define the essential terms with sufficient detail to allow court to determine parties' obligations).

2.    <u>There Was No Mutual Assent to Numerous Essential Terms of the</u>
Proposed Transaction

There was no offer with acceptance, and therefore no mutual assent to multiple essential

terms necessary to form a binding contract between Fulcrum and Strategic. While Fulcrum will

presumably argue that the only essential terms are price and quantity, this position glosses over

numerous terms that define the parties' potential obligations in the proposed transaction.

a.    *Recourse vs. Non-Recourse*

First, the parties never agreed on Strategic's potential recourse obligations, if any, upon

the sale of their bankruptcy claims to Fulcrum. This was the principal reason given by Mr.

Miller when he rejected of Fulcrum's PSA. Exh. C at 203:6-204:13; Exh. D at ¶¶ 4-5; Exh. L at

2:8-11. Importantly, recourse is a material term to be included in a contract for the sale of trade

claims. *See Bear Stearns Investment Products v. Hitachi Automotive Products (USA), Inc.*, 401

B.R. 598, 617 (S.D.N.Y. 2009) (recourse clearly not a trivial detail).

Fulcrum may assert that the STCs fully set forth both the fact that the transaction was on

a recourse basis and the contours of Strategic's recourse obligations. This is patently incorrect.

The STCs do not fully set forth any recourse obligations of Strategic that would potentially be

applicable subsequent to the sale, but instead merely state such provisions will be more fully set

forth in the PSA. Exh. F at ¶ 6. Moreover, no discussions regarding any facet of Strategic's

potential recourse obligations ever occurred prior to Mr. Miller's objection to the recourse

provisions set forth in the PSA. Exh. A at 44:24-45:17; Exh. C at 183:15-184:4. Indeed, Mr.

Herzog was conspicuously silent in his discussions and communications with Mr. Miller

concerning the concept of recourse generally.

The STCs can not form the basis of an enforceable contract as a matter of law because

they do not contain, and there was no agreement to, several material components of recourse.

For example, each of the following provisions would materially affect and determine the nature and extent of any recourse obligations:

- The act(s) or conditions that would trigger impairment of claims warranting recourse;

- Whether a claims objection would be sufficient to trigger a recourse obligation;

- The existence and extent of a recourse obligor's right to defend or cure a claims objection before a recourse would be triggered or owed;

- The period of time in which a recourse obligor would have the right to defend or cure a claims objection;

- Whether and the terms under which a recourse obligation would be enforceable prior to a final court order determining the value of claims;

- Allocation of the expense of defending or curing a claims objection; and

- The interest rate (if any) that would apply if a recourse obligation was enforced.

*See* Exh. F; Exh. H. It was only when the PSA was sent to Mr. Miller on February 23, 2010, that specific terms relating to these issues were first proposed. *Compare* Exh. F at ¶ 6 *with* Exh. I at ¶ 3. The failure of the STCs to specify the recourse obligations of Strategic demonstrates both that (1) the parties had not reached an agreement on the essential terms of recourse, and (2) Fulcrum knew recourse was subject to further negotiations and potential agreement.

Furthermore, Mr. Herzog's statements on February 23, 2010 demonstrate that Fulcrum was still negotiating as of that date and had not reached a final agreement. In particular, after Mr. Miller expressed his displeasure with the recourse provisions in the PSA, Mr. Herzog stated "We – if it's the language, then I think we can work through that. But what I was sending is nothing but what our standard document was and is, and *we expect comments to it*." Exh. L at 4:10-14 (emphasis added). The evidence proves that Mr. Herzog knew recourse was a material issue to Mr. Miller, that it was an issue to be negotiated, and that the parties had not reached an agreement.

> b.   *Aside from Recourse, Numerous Material Terms Were Never Agreed to Between the Parties*

The failure of the Parties to reach an agreement on recourse is sufficient to preclude formation of an enforceable contract. However, the summary judgment evidence demonstrates that the Parties never reached an agreement on several other material terms that defined their potential obligations in the proposed transaction.

### 1.   Representations and Warranties

There was no mutual assent with respect to the specific representations and warranties to which Strategic would be bound and obligated. Significantly, the Fifth Circuit has held that representations and warranties are material provisions that are necessary in a complex financial transaction. *See Knight v. Sharif*, 875 F.2d 516, 524 (5th Cir. 1989) (representations and warranties of each party were material to the risks and benefits of each party in a stock acquisition transaction).

As with recourse, the STCs merely state that the parties' representations and warranties will be more fully set forth in the PSA. In this instance, the PSA contained twenty-five (25) separate representations. Exh. B at 153:21-154:4. *Compare* Exh. F at ¶ 6 *to* Exh. I at ¶ 2.1(a)-(y). None of those representations and warranties were discussed or ever agreed upon by the parties. Indeed, Mr. Miller had never seen the litany of representations and warranties to which Fulcrum now claims Strategic should be bound until he received the PSA on February 23, 2010.

### 2.   Indemnity

There was no offer and acceptance as to indemnification despite indemnity obligations being material to a financial transaction of this complexity. *See Knight*, 875 F.2d at 524. The STCs do not contain an indemnity paragraph—in fact, the terms "indemnity" or "indemnify" are nowhere in that document. On the other hand, the PSA contains an entire paragraph regarding

indemnification.  Exh. B at 155:12-24; 157:7-158:4.  *Compare* Exh. F *to* Exh. I at ¶ 2.1.  Again, this was, by definition, a material term because it defined Strategic's obligations in this transaction.

### 3.      Confidentiality

There was also no agreement with respect to the confidentiality obligations of the party. A confidentiality provision can be an essential term to a contract.  *See Soliman v. Goltz,* 1993 WL 402740 at \*8 (Tex. App.—Dallas 1993, no writ) (no enforceable agreement when the parties' confidentiality obligations were never satisfactorily determined).  The STCs provide a brief confidentiality provision, however it was only to be binding up on the seller.  Exh. F at ¶ 11.  The PSA contains a more lengthy and onerous confidentiality provision applicable to the seller providing that Strategic would be liable for liquidated damages to the buyer in an amount equal to 25% of the purchase price in the event a breach of confidentiality.  Exh. I at ¶ 7.  There was no discussion regarding any of Strategic's confidentiality obligations and Strategic did not agree to any such provision.  Indeed, Mr. Hamilton admitted that Fulcrum placed this provision in the PSA precisely because they believed that Mr. Miller had already breached his (supposed) confidentiality obligations.  Exh. B at 160:21-161:11.

In sum, there was no offer and acceptance of numerous essential terms of the contemplated sale of Strategic's bankruptcy claims, including Strategic's representations and warranties, indemnification, and confidentiality.  Because the STCs did not articulate these essential terms, they could not form the basis for an enforceable contract.  When he was finally presented with a document that did define Strategic's potential obligations, Mr. Miller exercised his prerogative to terminate the negotiations between the Parties.  There was no binding contract, and, as such, Fulcrum's breach of contract claim fails as a matter of law.

B.    **If the Parties Entered into an Enforceable Contract, Fulcrum's Damages are Limited to the Demonstrable "Basis of the Bargain"**

Even if this Court determines that summary judgment is not appropriate on Fulcrum's breach of contract claim, Strategic seeks, in the alternative, summary judgment concerning the potential damages recoverable by Fulcrum in the event that it prevails on its breach of contract claim.

Specifically, Fulcrum's suggestion in its First Amended Complaint that it is entitled to disgorgement of Strategic's profits from the sale of the TOUSA Bankruptcy claims is contrary to settled contract law.  *See* First Amended Complaint at ¶¶ 31, 33.  Moreover, any other measure of damages based upon hypothetical transactions for which no evidence exists is unduly speculative to support an award for contract damages.  *See Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 808 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Tex. Instruments, Inc. v. Teletron Energy Mgm't, Inc.*, 877 S.W.2d 276, 279 (Tex.1994).) ("[a] party seeking to recover lost profits on a breach-of-contract claim must prove the loss with reasonable certainty.").  In short, assuming, *arguendo*, that Fulcrum can produce evidence that it had a ready, willing and able buyer for Strategic's bankruptcy claims, its damages are essentially capped at the net profits it would have realized from that subsequent sale.

Damages for contractual injuries protect three interests:  expectation interests, reliance interests, and restitution interests.  *Abraxas Pet. Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.).  Expectation, or "benefit of the bargain" damages place the plaintiff in as good a position as it would have been had the contract been performed.  *Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 760 (Tex. App.—Dallas 2004, pet denied).  Reliance damages restore any expenditures plaintiff made in reliance on the contract.  *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet denied).  Restitution

damages restore money taken from the plaintiff by the defendant in an attempt to place the plaintiff in as good a position as it would have been if no contract had been made. *See City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317 (Tex. App.—Austin 1992 (no writ).

In this instance, at the very most Fulcrum has claimed (but not proven) that it had an arrangement to immediately sell the TOUSA bankruptcy claims to Fortress once it closed the transaction with Strategic. If, *arguendo*, Fulcrum can demonstrate that such an agreement remained available at the time of the alleged breach then, at most, Fulcrum may recover what it would have earned upon selling the trade claims to Fortress as its expectation damages.[4]

Fulcrum claims that it had an agreement to purchase $46 million of trade claims from Strategic at a specific rate and for a specific price. Exh. H; Exh. B at 137:23-138:2. Fulcrum then asserts that it would have then sold those same claims to Fortress for a higher price. Exh. B at 137:9-16. As a result, had the sale with Strategic and Fortress been executed, Fulcrum claims it would have earned a profit, based upon the spread between the two contemplated transactions. Exh. B at 178:25-179:9. Accordingly, this alleged "expectation interest" is the most that Fulcrum should recover as actual damages if a jury finds a contract was formed and Fulcrum suffered damages. Any other assertion concerning expectation damages is unduly speculative. Moreover, any claim for disgorgement of profits is not a proper measure of damages for breach of contract and must fail as a matter of law.

**C.    If an Enforceable Contract was Formed, Unjust Enrichment is not an Available Measure of Damages—Without an Enforceable Contract, Fulcrum Cannot Demonstrate that Strategic was "Unjustly Enriched"**

Fulcrum has asserted an alternative claim against Strategic for "unjust enrichment."

---

[4] Strategic does not concede that the proposed sale to Fortress remained available at the time that Strategic terminated negotiations with Fulcrum. Moreover, Strategic maintains that any potential recovery is subject to Fulcrum's failure to mitigate its damages.

Plaintiff's First Amended Complaint at ¶¶20-21. In addition to the fact that Plaintiff has no basis to assert an interest in the TOUSA Bankruptcy claims outside of the disputed contract, Strategic's bankruptcy claims reflect $46 Million in economic losses, a small percentage of which were offset by Strategic's sale of its claims. The idea that Strategic was somehow "enriched," let alone unjustly, is simply not supported by the facts.

"Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory." *Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 684 (Tex. 2000) (citing *TransAmerican Natural Gas Corp. v. Finkelstein,* 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied).). Thus, "[w]hen a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." *Id.* "Accordingly, when a party claims that it is owed more than the payments called for under a contract, there can be no recovery for unjust enrichment if the same subject is covered by [the] express contract." *Id.* (internal quotations omitted). This principle has subsequently been applied to breach of contract plaintiffs that pled for unjust enrichment in the alternative. *See Ledig v. Duke Energy Corp.,* 193 S.W.3d 167, 176 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (affirming summary judgment that rejected claim for unjust enrichment, noting that, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory ...").

Damages for unjust enrichment are not an appropriate remedy merely because it appears fair or expedient to compensate the plaintiff for an unfortunate loss or because the benefit to the defendant was a windfall. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 42 (Tex. 1992). Furthermore, the fact that a party has made a profit is insufficient for the other party to be entitled to receive damages for unjust enrichment. *Burlington Northern R..R.. Co. v.*

*Southwestern Elec. Power Co.,* 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd,* 966 S.W.2d 467 (Tex. 1998). "The profit must be 'unjust' under principles of equity." *Casstevens v. Smith,* 269 S.W.3d 222, 230 (Tex. App.—Texarkana 2008, no pet. h.) (citing *Zapata Corp. v. Zapata Gulf Marine Corp.,* 986 S.W.2d 785, 788 (Tex. App.—Houston [1st Dist.] 1999, no pet.)).

Simply put, if there is no enforceable contract, Strategic was not unjustly enriched. Strategic never received anything of value from Fulcrum. There is no evidence that Fulcrum tendered payment for the trade claims or otherwise provided anything of value to Strategic. Fulcrum is not entitled to damages for unjust enrichment as a matter of law and summary judgment is appropriate on this claim.

**D.   Fulcrum's Claim of "Money Had and Received" Fails as a Matter of Law**

Finally, Fulcrum has pled a cause of action for "money had and received." *See* Plaintiff's First Amended Complaint at ¶ 23. As with the remedy of "unjust enrichment," there is no viable basis for this cause of action, even assuming Plaintiff's facts as true.

"Money had and received is an equitable action that may be maintained to prevent unjust enrichment when one person obtains money, which in equity and good conscience belongs to another." *Everett v. TK-Taito, L.L.C.,* 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.). "This action is not premised on wrongdoing, but looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Amoco Prod. Co. v. Smith,* 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ).

In the absence of evidence that Strategic held TOUSA claims on Fulcrum's behalf or that Fulcrum had some viable claim of ownership (aside from the disputed contract), Fulcrum's claim for money had and received fails as a matter of law.

## VI.   CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant Strategic Capital Resources, Inc. prays that this Honorable Court:

(1)     Grant Defendant's Amended Motion for Summary Judgment, ordering that Plaintiff take nothing by its claims against Defendant Strategic Capital Resources, Inc. and that the case be dismissed in its entirety; or

(2)     In the alternative, grant Defendant's Amended Motion for Summary Judgment in part and enter an order granting judgment in favor of Defendant on Plaintiff's causes of action and prayers for relief as requested herein; and

(3)     Order any further relief to which Defendant may be entitled either at law or in equity.

Respectfully submitted,

THOMPSON, COE, COUSINS & IRONS, L.L.P.


By: /s/ Michael B. Johnson
        Jeff D. Otto
        State Bar No. 15345500
        Michael B. Johnson
        State Bar No. 24029639
    701 Brazos, Suite 1500
    Austin, Texas 78701
    Telephone:  (512) 708-8200
    Telecopy:  (512) 708-8777

        Alison H. Moore
        State Bar No. 09836500
    700 N. Pearl Street, Twenty-Fifth Floor
    Dallas, Texas 75201-2832
    Telephone:  (214) 871-8200
    Telecopy:  (214) 871-8209

ATTORNEYS FOR DEFENDANT
STRATEGIC CAPITAL RESOURCES, INC.

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 17, 2010, the above and foregoing document was transmitted electronically to the clerk of the Court using the ECF System for filing and was served upon all counsel of record, via ECF, electronic mail:

Collin J. Cox
Deborah J. Karakowsky
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, TX 77010

<u>/s/ Michael B. Johnson</u>